STATE *ex rel.* BROWN VS. RUSK, Bank Comptroller.

*Lien of state upon interest of its bonds deposited by banks with comptroller attaches to substituted securities.*

1. A bank of this state purchased bonds of the state, paying seventy per cent in cash, and covenanting to pay the remaining thirty per cent. in semi-annual installments, with an agreement that said bonds should be deposited with the bank comptroller as security for the circulation of the bank, and that the state treasurer, on default in the payment of any such installment, might retain for the use of the state the amount thereof out of the interest money falling due on the bonds so deposited, if the circulation of the bank should then, in the opinion of the comptroller, be fully secured. These bonds were afterward withdrawn by the bank, and other securities received in lieu thereof, according to the provisions of the banking law. *Held,* that said bonds were held by the comptroller *in trust* for the payment to the state of any of said semi-annual installments which might remain otherwise unpaid (so far as this could be done with safety to the holders of the bills of said bank); and the bank had no right to withdraw said bonds and substitute other securities while any of such installments remained unpaid.
2. That the trust *attached to the securities so improperly substituted* for said bonds, in the comptroller's hands.

APPLICATION for a *Mandamus.*

The affidavit filed for the relator shows the following facts: In July, 1861, the state sold to the Bank of Columbus its bonds to the amount of $52,000, and received seventy per cent. on that amount, and the bond of the bank, conditioned for the payment of the remaining thirty per cent., in semi-annual installments of one per cent., with an agreement that the state bonds so purchased should be deposited with the bank comptroller as security for the circulation of the bank, and that the state treasurer, in case said semi-annual installments, or any of them, should not be paid as they became due, might retain for the use of the state, and in payment of such unpaid installments, the amount thereof out of the interest money falling due upon any bond belonging to said bank, in the possession

of such treasurer, if the circulation of said bank should then, in the opinion of the bank comptroller, be fully secured.   The bank at the same time executed to the state, and delivered to the state treasurer, its bond in the penal sum of $31,200, conditioned for the due payment of said thirty per cent. of the amount of said state bonds.   After said state bonds were so deposited with the comptroller, the bank collected in its circulating notes, and deposited them with the comptroller, withdrawing from time to time, as such deposits were made, like amounts of the state bonds deposited as security for the notes, until, on the 5th of June, 1862, its outstanding circulating notes amounted to only $7,388, and the bonds deposited as security therefor to only $7,000, beside $388 in money.   On that day the bank deposited with the comptroller $7,000 in specie (afterward substituting the same amount in United States treasury notes), in lieu of said Wisconsin bonds, which it then withdrew pursuant to law.   On the 28th of June, 1865, and thereafter, the bank gave due public notice (R. S. ch. 71, § 12) requiring its circulating notes to be presented at the comptroller's office for redemption within three years; and on the 29th of June, 1868, the time for redemption having expired, there remained in the comptroller's hands $1,384 of the treasury notes so deposited, and the bank had prior to that time assigned to the relator its right to the same, and had given him an order upon the comptroller for the same; but the comptroller refused, on demand, to make such payment, and denied the relator's right thereto.

The return of the bank comptroller to the alternative *mandamus* stated, in substance, that of the thirty per cent. of the purchase price of the state bonds sold to said bank as aforesaid, the installments which fell due between July 1, 1862, and January 1, 1868, both inclusive, amounting to $6,240, remained unpaid; that according to the condition of the bond given by said bank, and the true intent and meaning thereof, the bonds

purchased by it from the state were deposited with the bank comptroller in trust, first, to secure the circulation of said bank, and secondly, to secure to the state the balance due upon the price of said bonds, by the application thereto of the accruing interest on said bonds, so far as the same could be so applied without loss or injury to the holders of said circulation; that in June, 1862, when said bank withdrew the bonds of the state then remaining on deposit with said comptroller, the interest coupons attached thereto were worth in present money more than the sum of $1,384, being the sum here in controversy; that the $7,000 which was deposited in lieu of said bonds represented, and was the substitute for said coupons, as well as for the principal sum of said bonds.; that respondent has no knowledge or information sufficient to form a belief, whether the comptroller was of opinion, at the time of said substitution, that the circulation of said bank was not fully secured, and he is advised that the same trusts which attached to said bonds and coupons while in the comptroller's hands, attached to the fund into which they were so converted, and he is advised that it is his duty to retain, and he has been instructed by the state treasurer to retain, said sum of $1,384, to be applied to the payment of the balance due from said bank to the state upon the purchase price of said bonds.

Other grounds of defense were stated in the return, which need not be stated here. The relator answered, denying that, by the condition of the bond of the bank given to the state as aforesaid, or otherwise, the bonds purchased by the bank from the state were deposited to secure to the state the balance due upon the purchase price of said bonds, and alleges that the only lien which the state had on said bonds was *for accruing interest* on that portion of the purchase price thereof remaining unpaid while said bonds remained in the hands of the state treasurer, and that this was extinguished by the treasurer's delivery to said bank of said bonds on or before the fifth

of June, 1862; that, when said bonds were so delivered to said bank, there was no sum whatever due from said bank to the state for either principal or interest on the purchase price of the bonds. The answer therefore denies that the state ever had a lien upon, or interest in, said sum of $7,000 [in treasury notes] above mentioned, or any part thereof, or that any trust whatever attached thereto, while the same was in the hands of the comptroller, in favor of the state ; and denies that the money so deposited with the comptroller resulted from, or was the proceeds of, said bonds, or was the fund into which they had been converted. The answers to the other grounds of defense are omitted.

The respondent demurred to the relator's answer to his first defense.

*P. L. Spooner*, of counsel, for the demurrer, cited 1 Tif. & Bul. on Trusts, 11, 33; Lewin on Trusts, 22 Law Lib. p. 102; Story's Eq. Jur. §§ 1258, 1259, 1216, 1217, 1222; 1 Cox, 100; 15 Ves. 344; 16 id. 278–81; 6 Johns. Ch. 437; and argued at length that the lien of the state upon the interest coupons attached to the bonds deposited by the bank, to secure the payment of the unpaid purchase money of said bonds, attached in equity to the fund into which the bonds were converted, or which was deposited in lieu of the bonds ; and that the creator of the trust could not be allowed to take advantage of his own wrong in withdrawing the bonds, by claiming that the substituted fund was divested of the trust.

*Gregory & Pinney*, contra :

The bonds purchased of the state were deposited with the comptroller, and passed into the custody of the state treasurer, to be "held exclusively for the redemption of the bills or notes of such association," until the same should be redeemed. By the bond in question, the *treasurer* might, in a certain contingency, lay hold of the coupons or interest falling due on the bonds, and apply them to the payment of semi-annual install-

ments falling due the state on the bond; but this did not give him power to *lay hold of the bond itself*, or *its proceeds* when sold, nor did it authorize *any other person* or officer to take *any* of the property of the bank, and apply it to the payment of the debt due the state. At most, there was a conditional mortgage or pledge of the interest accruing on the bonds. These bonds were withdrawn under the provisions of secs. 47 and 13, ch. 71, R. S., and treasury notes, equivalent to specie, deposited with the *comptroller*, not with the treasurer, in lieu thereof. The money in question, therefore, is a substituted or exchanged security, and *not the proceeds of either bonds or coupons*. The agreement of pledge would not bind the new security for the circulation. It would not bind this property if it had been received in exchange for the pledged property. *Rhines v. Phelps*, 3 Gilm. 455.

Under the law, the treasurer had no custody or control directly of or over the treasury notes deposited with the comptroller. The bank never made any agreement giving either him or the comptroller any right in relation thereto, beyond such as he might have under the banking law, by virtue of his official position. The comptroller was in no sense the agent of the state. He was a trustee under the law, and held the fund to be applied, first, exclusively to the redemption of the bills of the bank (R. S. ch. 71, § 47); and, secondly, the surplus, after the time for redemption had expired, to be paid over to the order of the bank. Beyond the performance of these duties in relation to this fund, he had no authority whatever.

The question whether any lien exists in favor of the state has been once decided by this court, after full argument. *State ex rel. Marshall v. Rusk*, 21 Wis. 212.

Cole, J. In support of the demurrer to the first paragraph of the answer, it is claimed, that, under the agreement between the bank and the officers of the state, the bonds of the state

were held in trust for two purposes : first, to secure the out-standing circulation of the bank ; and secondly, for the appli-cation of the accruing interest on the bonds to the discharge of the purchase money due the state, if it could be so applied without injury to the bill holders ; that this agreement created an express trust to subserve the above purposes, and that if the bank which created the trust has converted or withdrawn the state bonds — the trust property — and deposited treasury notes in lieu thereof, the lien which attached to the bonds will, by operation of law, attach also to the fund into which the bonds were converted ; and that, as the trust for the benefit of the holders of the circulating notes has been completely ful-filled, that in favor of the state on the balance of the substituted fund is valid, and must be enforced. We are free to confess that this seems to be a correct view of the nature and effect of the agreement, and the principles of law applicable to it. In-deed, by its express language, the bank covenanted and agreed that the bonds deposited with the comptroller should remain as security for its then existing circulation, and moreover, in case it did not pay the installments when they became due — the circulation being secure — the treasurer was authorized to retain for the use of the state, and in payment of such unpaid installments, the amount thereof out of the interest money falling due upon any bond belonging to the bank, in the pos-session of the state treasurer. It is very manifest that this trust in favor of the state was not intended to interfere in any manner with the operation of the banking law, so far as the security of the bill holders was concerned, but the bank, by the agreement, relinquished the right to withdraw its securities deposited with the comptroller, which the banking law gave it. That the bank might relinquish this right to exchange securities, is a proposition which probably no one would con-trovert or contest. And that it did so by this agreement, until the purpose of the trust was fulfilled, seems to us very

clear. Having improperly withdrawn the bonds, in violation of its agreement, it cannot be allowed to say that the fund substituted by its own act, or by the act of itself and the trustee, is discharged of the trust which attached to the bonds, or to the interest falling due upon them. Upon this point, the remarks of Mr. Justice STORY, as found in section 1258, Eq. Jur., are strictly applicable. "Whenever," says he, "the property of a party has been wrongfully misapplied, or a trust fund has been wrongfully converted into another species of property, if its identity can be traced, it will be held, in its new form, liable to the rights of the original owner, or *cestui que trust.* The general proposition, which is maintained both at law and equity upon this subject, is, that if any property, in its original state and form, is covered with a trust in favor of a principal, no change of that state and form can divest it of such trust, or give the agent or trustee converting it, or those who represent him in right (not being *bona fide* purchasers for a valuable consideration without notice), any more valid claim in respect to it, than they respectively had before such change." Now, as we have already said, the bank, by its agreement, expressly fastened upon the bonds deposited with the comptroller a trust in favor of the state. It agreed that the accruing interest on the bonds might be applied to the payment of the unpaid purchase money whenever it made default, providing it could be so applied with safety to the bill holders. The fact that the property covered with the trust has been changed by the bank in violation of the agreement, does not divest it of the trust. To say that, notwithstanding this trust, the bank still retained the right to withdraw at any time the bonds by virtue of the provisions of the general banking law, seems to us clearly inadmissible.

But it is claimed by the counsel for the relator, that this question is entirely disposed of by the decision in *State ex rel. Marshall et al. v. Rusk*, 21 Wis. 212. But this, we think, is a

misapprehension of the extent of that decision.   The point, that, under this agreement, the bonds were held charged with a trust of a two-fold character, both to secure its existing outstanding circulation, and also for the application of the accruing interest on the bonds to the discharge of the purchase money due the state, is one which was not suggested by counsel on the argument of that case, and certainly did not occur to the court while examining the cause.   That case, we think, was rightly decided upon the questions argued by counsel and considered by the court.   A question which was entirely overlooked by counsel, and which was not even considered by the court, can hardly be said to have been settled by the decision.   We do not intend to call in question the correctness of the decision in the above case.   Upon the points covered by it, we think it is sound. But the view which we have been considering of the nature and effect of the agreement made by the bank, has for the first time been presented.

It results from these views that the demurrer must be sustained.

*By the Court.* — Demurrer sustained.