Porter vs. The State.

PORTER vs. THE STATE.

BANKING LAW: COSTS OF ACTION. *(1) Amendment of Banking Law.
(2, 3) Costs in action by comptroller on stockholders' bond, not charge-
able against the state.*

1. Under the constitution of this state, the banking law (of 1852) adopted
   by the people, could not be amended by mere statute, not submitted to
   the people. *Rusk v. Van Norstrand*, 21 Wis., 159, and earlier decis-
   ions of this court.
2. Under the banking law, all expenses (except the salary of the bank comp-
   troller) in administering the fund held in trust for the holders of the
   bills of any bank (to wit, the public bonds deposited with the state
   treasurer, and any personal bond given as additional security), were
   payable *from the fund itself*, and not chargeable to the state.
3. The bank comptroller himself cannot charge the state with the costs of an
   action brought on a personal bond which failed; nor can the defendant
   in such an action charge the state with such costs.

ACTION commenced in this court, to recover from the
state the amount of a certain judgment for costs rendered in a
court of New York against "Jeremiah M. Rusk, Bank Comp-
troller of the state of Wisconsin," in an action brought by
said Rusk as such comptroller. The complaint herein alleges,
in substance, that during the years 1868 and 1869, said Rusk

was bank comptroller of this state, and as such was duly authorized on behalf of this state to do the acts and prosecute the action thereinafter described; that previous to March 17, 1869, one Terry held, unredeemed, a large amount of the circulating notes of the Tradesman's Bank, a banking association under the laws of this state theretofore become insolvent; that Terry, claiming that James T. Soutter of New York was liable on a stockholder's bond for the redemption of said notes, demanded of the bank comptroller "to prosecute said claim on such bond;" that thereupon the comptroller commenced an action, on the day last named, in the supreme court of New York for Livingston county, "in which Jeremiah M. Rusk, Bank Comptroller of the state of Wisconsin, was plaintiff, and said James T. Soutter was defendant;" that in his complaint therein he alleged, besides his official character and the incorporation of the Tradesman's Bank, "the making, in compliance with the laws of Wisconsin, by certain parties, of the original stockholders' bond for the security of the holders of bills of said bank in case of its failure to redeem them, and the subsequent surrender of said bond [by one of said Rusk's predecessors in office], on receiving a stockholder's bond executed by said James T. Soutter to such then bank comptroller, his successors and assigns, and the subsequent surrender of said stockholder's bond to said James T. Soutter, on receiving in place thereof another bond made by still other parties; the failure of said bank; the sale of the securities pledged for the redemption of said bills as provided by law, and that there were not sufficient moneys realized from the proceeds of such securities to fully redeem the outstanding bills of said bank, and that there was a deficiency " of over $10,000 which should have been paid November 15, 1861; that by such complaint the plaintiff therein demanded judgment against said Soutter for the amount of the deficiency above named, with interest; that Soutter answered said complaint, " taking issue on material questions thereby presented;" that the venue was changed to

the county of New York; that judgment was rendered in favor of the plaintiff in that action, but that it was reversed on appeal to the general term, and the cause remanded for a new trial; that, Soutter having died, his executors were, on the application of Mr. Rusk, substituted as defendants, November 26, 1873, and the action revived and continued against them; that "the cause was further prosecuted against them accordingly, and they were put to great pecuniary expense, costs, loss and damage thereby, to wit, more than $2,000;" that the cause was again brought to trial, and on the 12th of February, 1876, judgment of nonsuit against the plaintiff therein, and for costs in the sum of $1,960.34, was rendered in favor of the surviving executors of said Soutter, which still remains in force, etc.; and that on the day last named execution was duly issued to the sheriff of the county of New York, and was returned unsatisfied April 13th, 1876. It is then alleged that the legislature of 1868 duly passed ch. 28, General Laws of 1868, which was duly ratified by the people at the general election in that year, to take effect on the first Monday in January, 1870, discontinuing the office of bank comptroller, and requiring the then incumbent to turn over all the effects of his office to the state treasurer, who was required to receive them and thereafter to perform all the functions of bank comptroller; that the surviving executors of said Soutter duly presented to the legislature of 1877 their claim against the state for payment of said judgment and interest, which the legislature refused to allow; that after such refusal, and on the 18th of February, 1878, said surviving executors sold and assigned said judgment to the plaintiff, appointing him their attorney, etc. It is then alleged that plaintiff is advised and charges that said Rusk, at the time of the commencement of said action, and in prosecuting the same, was a public state officer of the state of Wisconsin, and acting for and on behalf of said state, and was charged as such state officer, under the banking laws of said state, with the care and

custody of bonds of stockholders of banks, made for securing billholders of said banks, and it was his duty, under said banking law, to prosecute by action in any court having jurisdiction, all parties to such bonds on breach of the condition thereof, and to enforce by action the penalties and obligations of all such bonds, where the securities did not produce sufficient funds to redeem the circulating notes of such banks in full; and that, in said action against Soutter and his representatives, said Rusk, bank comptroller as aforesaid, was acting as the agent of, and for and on behalf of, said state of Wisconsin, and in discharge of the duty and trust imposed on and assumed by said state under and by said banking law, and its laws and constitution. It is further alleged, on information and belief, that neither said Rusk nor his predecessors in office ever had any funds with which to pay costs of litigation in actions in which the bank comptroller might be a party, but such costs have always been paid by the state; that the only funds ever in the hands of such officer were trust funds to redeem circulating notes, and all such funds for redeeming notes of the Tradesman's Bank had been paid out before the New York suit was commenced; and that, by reason of the premises, the state is liable and in duty and good faith bound to pay, etc. Judgment is therefore demanded against the state for the amount of said New York judgment, with interest.

Defendant demurred to the complaint as not stating a cause of action.

For the demurrer, a brief was filed signed by *Vilas & Bryant*, of counsel, with *Alexander Wilson*, Attorney General; and the cause was argued orally by *Wm. F. Vilas*.

*Geo. B. Smith* and *F. J. Lamb*, contra.

RYAN, C. J. The argument of this cause was learned and able, taking a wide range on both sides; and many questions were discussed which are immaterial to the view upon which the court rests the judgment. These will therefore not be considered.

The cause will be determined under the original banking law of 1852, adopted by the people. It is now too late to assume that the law might be materially amended by mere statute, not submitted to the people. *State v. Hastings*, 12 Wis., 47; *Van Steenwyck v. Sackett*, 17 Wis., 645; *Brower v. Haight*, 18 Wis., 102; *Rusk v. Van Norstrand*, 21 Wis., 159.

At the time of the adoption of the constitution, there was wide difference of opinion on the policy of establishing local banks of issue. There was great distrust, not so much of banks proper, as of their power to issue a local paper currency. And the constitution, as a compromise on the subject, took from the legislature the power to create banks; but permitted it to submit the question to the people; and if they should vote for banks, to submit to them a general banking law for their adoption or rejection. Thus came the banking law of 1852.

As might have been expected, in the circumstances, this law contains many safeguards to protect the paper currency which it authorizes, and no control over the banks to be established under it, in any other respect. The only concern of the state was to secure, as far as it could, a safe local paper currency. The state had no interest in the banks. It is a great mistake to suppose that the tax required to be paid by them was an emolument coming to the state from the bank comptroller's office. That is their share of the public burdens, imposed by an exercise of the taxing power. The state had a public policy in the system, but no interest; no pecuniary connection with the banks; no interest in their currency, except as a possible holder of their bills, in common with all other holders.

Doubtless, the bank comptroller was a public officer, having duties to perform towards the state. But these concerned the policy of the state, not its interest. They all looked to the protection of the holders of the currency to be issued by the banks. Indeed, that appears to be the object of every provision of the banking law, except the power conferred upon

the banks themselves. And not only are the duties of the bank comptroller directly towards the state, for the benefit of the holders of the currency issued by the banks; but the great burden of that officer's duties is towards private corporations and private persons, the banks themselves and the holders of their currency; wholly for the protection of the latter. These, therefore, if not all strictly private, partake largely of a private character. Their object is the protection of private, not of public right.

The primary security of the holders of the currency is the deposit of public bonds with the state treasurer, in trust to secure the currency. The state takes no title to these bonds; has no interest in them, except as a possible holder of the currency which they secure. The title to them remains in the banks, but they are held by the treasurer by way of pledge, in trust for the holders of the currency. The treasurer was selected as the pledgee, instead of the bank comptroller, not for any interest of the state, but presumably for the greater safety of the bonds themselves.

Upon dishonor of the currency of any bank, the bank comptroller is required to sell the bonds, and to apply the proceeds to the payment of the currency. But the law throughout recognizes the possibility that the proceeds of the public bonds might prove insufficient to pay the dishonored currency in full. And it therefore provides for a personal bond to the bank comptroller, as an additional security for the holders of the currency, against loss which might otherwise be sustained through the insufficiency of the proceeds of the public bonds. This is a secondary security, to which resort can be had only upon failure of the primary security, and to supply any deficiency of the latter. The *cestui que trusts* of both securities are the same — the holders of the currency secured by them. The state takes no title to this personal bond; has no interest in it, except as a possible *cestui que trust* with other holders of the currency. The public bonds pledged with the

treasurer, and the personal bond to the bank comptroller, are primary and secondary securities for one trust fund, to indemnify the holders of the currency secured by them against loss.

Thus the state requires both securities, and furnishes the machinery to enforce them, without right or interest as a state, solely to protect the private rights of private persons ; solely as a matter of public policy, that the holders of the currency which it authorizes should have the securities provided against loss.    The state assumes no liability; gives no guaranty of the currency; goes no further than to provide such security for it as legislative wisdom devised.    Having done this, the state has no further concern in the premises. The holders of the currency take it at their own risk only, under the securities provided by the state in trust for them.

By the law, the state assumes the compensation of the comptroller; but assumes no other expense; assumes no risk of other expense.    There is not a provision, not a phrase, throughout the law, indicating any assumption by the state of any other expense in the administration of the law, for the protection of holders of the currency.    Beyond the bank comptroller's compensation, the only obligation assumed by the state is the proper application of the bonds pledged with the treasurer for the redemption of the currency; a mere guaranty of the integrity of its public officers.

The law expressly designates this pledge as a trust, and the proceeds of the pledge, when sold, as a trust fund, to redeem the currency secured by the pledge.    And the trust fund, as other trust funds, is properly chargeable with the expense of administering it; and is so left by the law.    The sale of the public bonds deposited with the treasurer, and any action on the personal bond to the comptroller, are successive steps in one proceeding to realize the trust fund for the benefit of the *cestui que trusts*, in which the state has no interest; and all expenses of the proceeding are a burden upon the fund, and

not upon the state. That is the obvious effect of the law, to be gathered from what it provides, and what it does not provide.

The deficiency of the securities pledged with the treasurer to pay the outstanding currency, occurs upon their sale by the comptroller. Then the right of action accrues upon the personal bond. It is quite remarkable that the law imposes no duty on the bank comptroller to take any steps towards enforcing this right of action. It is entirely silent upon the subject. It directs the bank comptroller to sell the public bonds, in a stock market where they are always salable. That was an obvious necessity in all cases. But the failure of the bank or other causes might well affect the solvency of the obligors in the personal bond. That and other contingencies might well make action on the bond injudicious. And the silence of the law appears to leave proceedings to enforce the personal bond to the discretion of the bank comptroller. Doubtless, if the bond should remain good, it would be the duty of that officer to his *cestui que trusts* to supply the deficiency by action upon it. In that case it would be his right to retain sufficient of the trust fund in his hands, to cover the expenses of the action. He had no power from the state to pay out the entire proceeds of the sale of the public bonds, and to bring the action at the risk of the state, or to charge the state with the expenses of it. He owed no duty to his *cestui que trusts* to commence the action without reserving enough of the trust fund to indemnify himself. Doing so, he would do it at his own risk, not at the risk of the state. The state would have no interest in any action on the bond. And the bank comptroller took no authority to bring any action on behalf of the state, or to charge the state with the costs of any action he might bring for his *cestui que trusts*. And, bringing the action at his own risk of the expense, if there is any remedy over, it is against them only. If he should so conduct the proceeding as to have none against them, it is

his own loss, arising by his own laches, with which the state has no concern.

Of course, if the bank comptroller himself cannot charge the state with the costs of an action brought on a personal bond which failed, the defendant in the action, recovering costs against him, cannot. The only right to which the latter could pretend would be under the bank comptroller, and could be no greater than his.

*State v. Rusk*, 21 Wis., 214, and *State v. Rusk*, 23 Wis., 636, have been carefully considered. There is nothing in either of those cases apparently in conflict with the views now held. On the contrary, there are things said in both cases, especially. in the latter, which tend to confirm, and indeed to suggest, the position now taken.

This discussion has assumed the validity of the bond sued by the bank comptroller in this case. If the bond were invalid, as the judgment against him seems to suggest, the discussion applies with double force. For it would be difficult to hold that the bank comptroller acted officially in bringing an action on an unofficial bond.

*By the Court.* — The demurrer is sustained.